IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:13-CT-3264-FL
NO. 5:14-CT-3104-FL

| | | |
|---|---|---|
| FERNANDO PALMA CARIAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| DONNIE HARRISON, Sheriff; E.A. BLOMGREN, Investigator; JAMES MICHAEL CORNAIRE, Deputy Sheriff; DWIGHT YOKUM; NARDINE MARY GUIRGUIS; DRUG ENFORCEMENT AGENCY DIRECTOR; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT AGENCY DIRECTOR; CHRISTOPHER BRANT; TOM HALVAS; ERIC HOLDER; UNIDENTIFIED INDEMNITOR FOR WAKE COUNTY; WILLIAM ATWELL; LANCE ANTHONY; MICHAEL WILLIAMS; D. TAYLOR; DRUG ENFORCEMENT ADMINISTRATION; THE UNITED STATES; and K. MANNING, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

These consolidated cases are before the court on defendants' respective motions for summary judgment (DE 127, 132, 135). Also before the court is plaintiff's motion for the court to "apply the presumption test toward all defendants" (DE 182). The issues raised have been fully briefed and are ripe for adjudication. For the following reasons, the court denies plaintiff's motion to apply the presumption test and grants defendants' respective motions for summary judgment.

# STATEMENT OF THE CASE

On October 25, 2013, plaintiff, a state inmate, instituted this action pursuant to 42 U.S.C. § 1983, against defendants Wake County Sheriff Donnie Harrison ("Harrison"), Wake County Investigator E.A. Blomgren ("Blomgren"), and Wake County Deputy Sheriff James Michael Cornaire ("Cornaire") (collectively referred to as the "Sheriff's defendants"). See Carias v. Harrison, 5:13-CT-3264-FL (E.D.N.C. Oct. 25, 2013) ("Carias I"). Then, on April 28, 2014, plaintiff instituted an action pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), against defendants the United States, Drug Enforcement Agency ("DEA"), DEA Agent William Atwell ("Atwell"), DEA Agent Lance Anthony ("Anthony"), Harnett County Investigator Michael Williams ("Williams"), DEA Agent D. Taylor ("Taylor"), and DEA Agent K. Manning ("Manning"). See Carias v. the Drug Enforcement Agency, 5:14-CT-3104-BO (E.D.N.C. Apr. 28, 2014) ("Carias II"). Plaintiff subsequently added Dwight Yokum ("Yokum"), a Wake County Sheriff's Office Investigator, as a defendant. The court, however, dismissed plaintiff's action against Yokum without prejudice on November 6, 2014. On May 11, 2015, the court consolidated the actions in Carias I and II, and directed plaintiff to file one particularized amended complaint.

Plaintiff filed his particularized complaint alleging claims pursuant to 42 U.S.C. §§ 1983, 1981, and Bivens, and added the following new parties: Nardine Mary Guirguis ("Guirguis"), an attorney; the United States Immigration and Customs Enforcement ("ICE") Director; United States Attorney General Eric Holder; the DEA Director; an unidentified ICE agent; ICE Special Agent Christopher Brant ("Brant"); and the unidentified indemnitor for Wake County. Specifically, plaintiff alleged the following claims against defendants: (1) excessive force and failure to protect

2

in violation of the Eighth and Fourteenth Amendments to the United States Constitution; (2) due process claims pursuant to the Fifth and Fourteenth Amendments; (3) involuntary servitude in violation of the Thirteenth Amendment; (4) illegal search and seizure in violation of the Fourth Amendment; (5) extortion in violation of the Hobbs Act under 18 U.S.C. § 1951; (6) violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962; (7) violations of the Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75–1; (8) violations of North Carolina's Constitution, Article I §§ 17, 19, 27; and violations of the Due Process Clause of the Fourteenth and Fifth Amendments to the United States Constitution. (Am. Compl. p. 9.) As relief, plaintiff sought monetary damages as well as declaratory and injunctive relief. (Id.) Defendant Manning, defendant Guirguis, and the federal defendants subsequently filed respective motions to dismiss.[1]

On March 23, 2016, the court issued the following rulings: granted plaintiff a continuance to conduct discovery, and construed defendants' dispositive motions as motions to dismiss pursuant to Rules 12(b)(1) and (6); extended the case management deadlines to accommodate discovery; denied plaintiff's motion to appoint counsel; dismissed plaintiff's Hobbs Act claims and FTCA claims pursuant to 28 U.S.C. § 1915(e)(2)(B); denied defendant Manning's motion to dismiss; granted defendant Guirguis' motion to dismiss and dismissed Guirguis from this action; and directed the clerk to substitute Tom Halvas ("Halvas") for the party plaintiff referred to as the "unidentified ICE agent" in his amended complaint. The court also granted in part and denied in part the

---

[1] In the interests of brevity the court has set forth a brief recitation of the factual history of the action for the time period of October 25, 2013, through March 23, 2016. A more comprehensive recitation of the factual history for this time period is set forth in the court's March 23, 2016, order.

3

remaining federal defendants' motion to dismiss. Specifically, the court denied the federal defendants' motion as to plaintiff's claims pursuant to the Eighth, Fifth, Thirteenth, and Fourth Amendments, as well as plaintiff's RICO and North Carolina State Constitutional claims. Plaintiff's official capacity claims for injunctive relief also remained pending against the federal defendants, but the court granted the federal defendants' motion to dismiss as to plaintiff's remaining claims.

On the same date, plaintiff filed a motion to compel discovery. In response, the Sheriff's defendants requested additional time to respond to plaintiff's discovery requests because such requests were voluminous. On April 6, 2016, the federal defendants filed a motion for leave to depose plaintiff and a motion to shorten the time for plaintiff to respond to the federal defendants' motion. The court then granted the federal defendants' motions to depose plaintiff and to shorten the response time. The court also allowed the Sheriff's defendants additional time to respond to plaintiff's discovery requests, and denied as moot plaintiff's motion to compel.

On June 9, 2016, plaintiff again filed a motion to compel, to which the federal defendants responded. Plaintiff then filed an additional motion to compel discovery. On July 28, 2016, the federal defendants filed the instant motion for summary judgement, arguing that plaintiff is unable to establish a constitutional violation, or, in the alternative, that they are entitled to the affirmative defense of qualified immunity. The federal defendants also submitted a statement of material facts and an appendix which included the following attachments: plaintiff's deposition transcript; responses to the federal defendants' interrogatories; declarations from non-parties Michael Troster

4

("Troster"),[2] Thomas O'Connell ("O'Connell"),[3] as well as defendants Halvas, Williams, and Taylor; crime scene entry report; power of attorney; motion for temporary restraining order; preliminary injunction; and the Last Will and Testament of Marisol Rojas ("Rojas"), an individual plaintiff describes as his common law wife. The federal defendants' motion for summary judgment was fully briefed.

On July 29, 2016, defendant Manning filed the instant motion for summary judgment arguing that plaintiff failed to establish a constitutional violation, or in the alternative, that he is entitled to the affirmative defense of qualified immunity. Defendant Manning also submitted a statement of material facts and an appendix to which he attached the same exhibits the federal defendants attached to their motion for summary judgment.

Also on July 29, 2016, the Sheriff's defendants filed the instant motion for summary judgment arguing that plaintiff failed to establish a constitutional violation, or in the alterative, that they are entitled to the affirmative defense of qualified immunity. The Sheriff's defendants attached to their motion a statement of material facts and an appendix.[4] The Sheriff's defendants' appendix included the following: affidavits from defendants Blomgren, Cornaire, and Harrison, as well as

---

[2] Troster served as the Resident Agent in Charge of the Raleigh DEA office from August 2010 through June 2016. (Troster Decl. ¶ 1).

[3] O'Connell has served as the Resident Agent in Charge of the Cary ICE office since 1999. (O'Connell Decl. ¶ 1).

[4] The Sheriff's defendant's originally filed their motion for summary judgment on June 2, 2016, and sought leave to file their memorandum of law, affidavits, and exhibits at a later date. The court granted the motion.

non-parties Jebediah Yoakum,[5] Charles Timothy Blake ("Blake"),[6] Wake County Sheriff's Deputy

Derrick Johnson ("Johnson"), Christian Fernando Palma ("C. Palma"), Fernando Alexander Palma

("A. Palma"),[7] Raleigh Police Department Officer Eric Michael Vigeant ("Vigeant"), Wake County

Sheriff's Major Charles West ("West"), plaintiff and Rojas' Last Will and Testament; plaintiff and

Rojas' power of attorney; check number 1041; receipt for $5,000.00; lottery ticket; order on

foreclosure; child custody order; letters testamentary for Rojas; default judgment; preliminary

injunction; memorandum of disbursement and checks; transcript of plea; Child Protection Services

letter; civil complaint (case number 13CVS08801); motion for a temporary restraining order; order

to sell real property; report of real estate sale; order confirming real property sale; final report of real

estate sale; check number 1047; plaintiff's request for admissions in case number 13CVS08801;

motion for a temporary restraining order in case number 13CVS08801; bank statement; BB&T

account summary; repayment agreement; search report; hearing transcript in case number

13CVS08801; plaintiff's motion for appropriate relief; and order to dissolve receivership.

On September 6, 2016, plaintiff filed motions to stay, for an extension of time, and to

appoint counsel. On December 16, 2016, the court denied plaintiff's motion to appoint counsel, but

granted in part and denied in part plaintiff's motions to compel. The court granted plaintiff's

motions to compel to the extent plaintiff requested a copy of his deposition transcripts, but the

remainder of the motions were denied. The court also denied plaintiff's motion to stay ruling on the

---

[5] The court notes that it is not clear whether the affidavit submitted by Jebediah Yoakum is submitted by the same person as former defendant Dwight Yokum.

[6] Blake is an attorney who was retained by defendant Cornaire to represent the Estate of Rojas in a wrongful death action filed by the estate. (Blake Decl. ¶ 4).

[7] C. Palma and A. Palma are plaintiff's sons.

pending motions for summary judgment, but allowed plaintiff an extension of time to supplement his response to the pending motions for summary judgment. Plaintiff subsequently filed his supplemental responses. Plaintiff attached voluminous exhibits in response to the respective dispositive motions and his supplemental responses.

On January 10, 2017, plaintiff filed a motion to strike pursuant to Federal Rule of Civil Procedure 12(f) and then filed a second motion to stay ruling on the pending dispositive motions. The motions were fully briefed. On February 7, 2017, the court denied plaintiff's motions. After the court's ruling, plaintiff replied to his motion to strike. On February 16, 2017, plaintiff filed a motion requesting that the court "apply the presumption test toward all defendants." The motion was fully briefed. On March 15, 2017, the court entered a text order notifying the federal defendants and defendant Manning that Exhibit 1 to the Michael Troster affidavit was missing and directed these defendants to file the missing exhibit. The exhibit was filed the following day.

## STATEMENT OF FACTS

Plaintiff immigrated from Honduras to the United States in 1992. (Mem. in Supp. of Compl. p. 10). Plaintiff owned and operated several businesses under the names Mexico Lindo, Carias Properties, and Carias Construction. (Id.; Fed. Def. Appx. p. 205). The businesses operating under the Mexico Lindo name included a "money transfer service," a grocery store, and "another [] store." (Mem. in Supp. of Compl. p. 15). Plaintiff also owned and operated Flamingo's Bar and Grill. (Fed. Def. Appx. p. 205). The DEA began investigating plaintiff for money laundering in October 2005. ((DE 96), Ex. T).

In 2006, plaintiff met defendant Cornaire. (Cornaire Aff. ¶ 5). At that time, defendant Cornaire was employed as a Wake County Sheriff's Deputy, but also owned and operated a part-

time vending machine business during his off duty time.  (Id.)  It was through defendant Cornaire's vending machine business that he and plaintiff became acquainted because defendant Cornaire purchased items for his vending machines from plaintiff's store.  (Id.)  Over time, the personal relationship between plaintiff and defendant Cornaire grew closer, and their families began to socialize together.  (Id. ¶ 6).  Through their social relationship, defendant Cornaire learned that plaintiff and Rojas were illegal aliens, but that their children were citizens of the United States.  (Id.)  On April 1, 2007, plaintiff loaned defendant Cornaire $10,000.00 to use toward expanding defendant Cornaire's vending machine business.  (Id. ¶ 11; Sheriff's Def. Appx. Ex. 15; Mem. in Supp. of Compl. p. 14).  The parties dispute whether defendant Cornaire re-paid the loan.  (Id. ¶ 11; Mem. in Supp. of Comp. p. 15).

In 2007, plaintiff made contact with the DEA.  The parties, however, dispute how plaintiff's contact with the DEA was initiated.  According to plaintiff's version of events, defendant Cornaire approached plaintiff and informed plaintiff that he was under investigation by the DEA for money laundering.  (Mem. in Supp. of Compl. pp. 12-13).  Defendant Cornaire, however, states that plaintiff wanted to work for the DEA and asked defendant Cornaire to arrange a meeting between plaintiff and the DEA.  (Cornaire Aff. ¶ 9).  The parties agree that defendant Cornaire ultimately facilitated a meeting between plaintiff and the DEA, and that Cornaire accompanied plaintiff to the meeting.  (Id.)  Cornaire states that he was not acting in his official capacity as a Deputy Sheriff when he referred and accompanied plaintiff to the DEA.  (Id.)

At the Raleigh DEA office, plaintiff and defendant Cornaire met with DEA officer defendant Atwell, and plaintiff agreed to provide the DEA assistance in the investigation of drug targets.  (Atwell Decl. (DE 89) ¶ 3).  On July 16, 2014, plaintiff executed a statement indicating his desire

to serve as a confidential informant ("CI") for the United States Government. (Fed. Def. Appx. pp. 25-26; 123-125). Plaintiff states that the letter was coerced and that he only agreed to act as a CI for the DEA under threats of arrest and deportation. (Id. pp. 22-23). However, plaintiff later reported to a psychologist that he agreed to serve as a CI "because [plaintiff] felt it would be a way to help the United States." ((DE 96), Ex. S-1). Plaintiff additionally states that defendants Cornaire and Atwell also told plaintiff that in exchange for serving as a CI for the DEA, plaintiff would receive immunity from prosecution "arising out of the investigation of the Mexican drug cartel," payment for his services, protection from "harms way," and American citizenship for himself and his family. (Mem. in Supp. of Compl. pp. 13, 14). The DEA defendants dispute that they coerced plaintiff into serving as a CI and that plaintiff was promised immunity, citizenship, or payment for his services. (Troster Decl. ¶ 10; O'Connell Decl. ¶ 8; Atwell Decl. (DE 89), ¶ 11; Williams Decl. ¶¶ 7-8).

Due to the fact that plaintiff was an illegal alien, DEA policy prohibited plaintiff from being documented as a CI. (Atwell Decl. (DE 89), ¶ 4). As a result, defendant Atwell contacted ICE and requested assistance in documenting plaintiff as a CI. (Id. ¶ 5). On July 12, 2007, ICE provided plaintiff with a form captioned "Instructions to a Confidential Source," which included an instruction notifying plaintiff that his "assistance and the statements [plaintiff makes] to U.S. Immigration and Customs Enforcement are entirely voluntary." (Fed. Def. Appx. p. 126). Plaintiff signed the document. (Id.) In August 2007, ICE documented plaintiff as a CI so that plaintiff could also provide assistance to both the DEA and ICE. (O'Connell Decl. ¶ 5). Defendant Brant, an ICE special agent, served as plaintiff's ICE handler. (Id.; Brant Decl. (DE 89), ¶ 4). While plaintiff served as a CI for the DEA and ICE, ICE provided plaintiff with documentation which allowed

plaintiff to reside in the United States until July 14, 2009, and to work in the United States until September 8, 2009. ((DE 89), Ex. 2).

Plaintiff states that after he began working for the DEA, defendant Cornaire "began to realize how much money [plaintiff] was transferring from [his] business to other designations via wire, and in consideration of other monies seized by the DEA through [his] assistance, [Cornaire] began to demand large sums of money from [plaintiff] on a regular basis" and asked plaintiff not to tell law enforcement. (Mem. in Supp. of Compl. p. 14). In particular, plaintiff asserts that he received a large sum of money from Serafin Castaneda ("Castenada")–a DEA target. (Id. p. 16). Defendant Atwell instructed plaintiff to deposit the money from Castenada into plaintiff's business account "and to refuse the transfer and return [Castaneda's] money by a check from [plaintiff's] business account, and to forward a copy of that check to the DEA." (Id.) Plaintiff states that when Cornaire learned about the money, Cornaire demanded that plaintiff give him the money and not report the exchange to the DEA. (Id.) Plaintiff states that he complied with Cornaire's allegd demands and replaced the missing funds with his own money. (Id.) Defendant Cornaire denies that he ever extorted money from plaintiff. (Cornaire Aff. ¶ 11). Cornaire, however, states that he did obtain a $5,000.00 loan from plaintiff on July 26, 2008. (Id.; Ex. 16). During this time period, defendant Cornaire assisted in obtaining dismissals for two traffic tickets. (Cornaire Aff. ¶ 10).

On September 10, 2008, Vigeant, a Raleigh Police Officer, responded to a call concerning an armed robbery and shooting at plaintiff's Mexico-Lindo store on Wake Forest Road in Raleigh, North Carolina. (Vigeant Aff. ¶ 3). Vigeant interviewed plaintiff, and plaintiff explained that he arrived at the scene after the robbery and that he had been the victim of a home invasion robbery approximately three weeks before the robbery Vigeant was investigating. (Id. ¶ 8). At some point

in the investigation, Vigeant removed a handgun which had been kept in the store for security. (Id. ¶ 9). The handgun was a 9mm, P89 model with the serial number of 31477635, which was the same handgun plaintiff later used to kill Rojas. (Id. ¶ 10; Yoakum Aff. ¶ 10). Vigeant then returned the firearm to plaintiff on September 11, 2008. (Vigeant ¶ 12). Plaintiff's sons, additionally, attest that plaintiff had multiple handguns both at plaintiff's home and at his businesses. (Christian and Alex Palma Affs. ¶ 8).

On January 14, 2009, plaintiff and Rojas asked defendant Cornaire to serve as the secondary executor of their respective wills and to serve as guardian and trustee of their two minor children in the event of the death of plaintiff and Rojas. (Cornaire Aff. ¶ 7; Sheriff's Def. Appx. Ex. 12). On the same date, defendant Cornaire signed documents agreeing to serve as power of attorney for plaintiff and Rojas.[8] (Id. ¶ 7; Sheriff's Def. Appx. Ex. 13). Plaintiff also states that Cornaire convinced him to take out life insurance policies on himself and Rojas.[9] (Mem. in Supp. of Compl. p. 20).

At some point ICE determined that plaintiff no longer was providing substantial assistance with any ICE investigation and revoked plaintiff's immigration documentation on February 23, 2009. (Brant Decl. (DE 89), ¶7; Ex. 2). On the same date, ICE agents, defendants Brant and Halvas, arrested plaintiff on immigration violations and transported plaintiff to the Cary, North Carolina field office for immigration processing. (Id. ¶ 8; Ex. 3, 4; Halvas Decl. ¶ 5). Plaintiff states that as defendants Brant and Halvas were transporting plaintiff to the Cary field office, defendants Brant

---

[8] The power of attorney was not filed until July 10, 2012, after plaintiff was arrested for killing Rojas. (Cornaire Aff. ¶ 16 and Ex. 13).

[9] There is no evidence in the record reflecting that defendant Cornaire was a beneficiary of any life insurance policy held by plaintiff or Rojas.

11

and Halvas became upset that plaintiff was providing the DEA assistance and called plaintiff a "Damn Immigrant" and stated "you work for ICE from now on." (Mem in Supp. of Compl. p. 18). Plaintiff states that Brant became "livid" when he discovered plaintiff had signed a contract with the DEA and began punching [plaintiff] in the stomach and crotch . . . while [plaintiff] was in handcuffs." (Id.) Plaintiff states Brant threatened to kill plaintiff and then both officers began punching plaintiff in the "back, stomach, and legs." (Id.) Plaintiff states the officers threatened plaintiff with deportation and plaintiff ultimately agreed to cooperate with ICE. (Id.) Defendants Halvas and Brant deny assaulting plaintiff. (Halvas Decl. ¶ 7; Brant Decl. ¶ 10).

After his arrest plaintiff called defendant Cornaire. (Mem. in Supp. of Compl. p. 18). Plaintiff states that defendants Cornaire and Atwell assisted him with obtaining the services of attorney Nardine Mary Guirguis to represent plaintiff in his immigration proceedings. (Fed. Def. Appx. pp. 62-63). Plaintiff states that he paid Cornaire $400.00 to secure plaintiff's release from ICE custody. (Mem. in Supp. of Compl. p. 18). On September 15, 2009, plaintiff signed a new agreement to act as a CI for the DEA. (Fed. Def. Appx. pp. 131-132). Plaintiff, however, was deactivated as a CI for the DEA on October 16, 2009, because plaintiff admitted that he had purchased a quantity of cocaine without law enforcement concurrence or participation. (Troster Decl. ¶ 6 and Ex. 1). Defendant Atwell, plaintiff's DEA handler, retired on January 15, 2010. (Atwell Decl. (DE 89), ¶ 1; (DE 150), p. 7).

On November 14, 2009, plaintiff had a dispute with an individual, Juan Manuel Cardona, at plaintiff's residence. (Mem. in Supp. of Compl. p. 15). Plaintiff called both the police and defendant Cornaire for assistance, and Cornaire arrived at plaintiff's house first. (Id.) Plaintiff states that Cornaire conducted a search of plaintiff's residence before the police arrived and found

a gun, which Cornaire insisted plaintiff keep. (Id.) Cornaire disputes that he provided plaintiff with a gun. (Cornaire Aff. ¶ 15). At some point, Johnson, a Wake County Sheriff's Deputy, arrived at plaintiff's residence. (Johnson Aff. ¶ 7). When Johnson arrived at plaintiff's residence, defendant Cornaire informed Johnson that Cornaire was a friend and business associate of plaintiff. (Id.) Cornaire also informed Johnson that plaintiff and Cardona were having an argument and that plaintiff wanted Cardona, who had been drinking, to leave. (Id.)

After interviewing plaintiff and Cardona, Johnson discovered that Cardona had been staying with plaintiff for approximately four months and that Cardona worked for plaintiff. (Id. ¶ 8). Accordingly, Johnson determined that the issue was a landlord-tenant dispute and that he could not force Cardona to leave plaintiff's residence. (Id.) Johnson advised plaintiff to go to the Office of the Wake County Clerk of Court to institute a Summary Ejectment Action against Cardona. (Id.) After Johnson advised plaintiff and Cardona of the situation, Cardona told Johnson that plaintiff had pulled a gun on him, and plaintiff denied Cardona's allegation. (Id. ¶ 9). Plaintiff, in turn, told Johnson that Cardona had pushed him, which Cardona denied. (Id.) Plaintiff and Cardona then agreed to settle their dispute in court and Johnson left the scene. (Id. ¶ 11).

In February and March of 2010, plaintiff hired defendant Cornaire to provide security at plaintiff's Flamingo Bar and Grill. (Cornaire Aff. ¶ 8). Plaintiff provided defendant Cornaire four separate checks as payment for Cornaire's security services. (Id.; Sheriff's Def. Appx. p. 203). Plaintiff states that he did not pay defendant Cornaire to provide security services, but that he paid the $400.00 checks to Cornaire in response to threats from Cornaire. (Sheriff's Def. Appx. p. 203; Mem. in Supp. of Compl. p. 14). The subject lines of the checks in question are labeled "security." (Sheriff's Def. Appx. p. 203). In March of 2010, Rojas purchased a $5,000.00 winning North

13

Carolina State lottery ticket. (Cornaire Aff. ¶ 12 and Ex. 17). On April 16, 2010, Rojas asked defendant Cornaire to cash the lottery ticket and to give her the proceeds. (Id.) Rojas was concerned that, as an illegal alien, she would not be able to claim the prize and told Cornaire that she needed the money to post bond for plaintiff so that plaintiff could be released from ICE custody. (Id.) Cornaire then cashed the lottery ticket and received $4,651.40 in net proceeds. (Id.; Yoakum Aff. ¶ 9). Cornaire paid the additional taxes owed for the lottery winnings on his 2010 income tax return. (Cornaire Aff. ¶ 12 and Ex. 17). The parties dispute whether defendant Cornaire gave the lottery proceeds to Rojas. (Id.; Mem. in Supp. of Compl. p. 21).

On January 26, 2012, while Williams was conducting a drug surveillance operation, the Atlanta, Georgia DEA informed the Raleigh DEA that individuals, who were located at the Comfort Inn on South Saunders Street in Raleigh, North Carolina were in the process of searching for a warehouse in the Raleigh area to serve as a stash house for narcotics. (Williams Decl. ¶¶ 3, 4). The surveillance team identified the participants, followed them to a warehouse, and took pictures of them. (Id. ¶ 4). DEA agents identified one of the participants as plaintiff. (Id.) DEA agent Donald Wimmer was familiar with plaintiff because plaintiff had served as a CI in the past. (Id.)

In February 2012, defendants Anthony and Williams met with plaintiff at one of plaintiff's businesses and discussed plaintiff's involvement with the drug cartel. (Id. ¶ 5; Anthony Decl. (DE 89), ¶ 5). Plaintiff agreed to cooperate with the DEA, and defendants Anthony and Williams later met with plaintiff and plaintiff's attorney, at the attorney's office, and debriefed plaintiff regarding his knowledge of the drug cartel and the cartel's use of the warehouse in Raleigh as a stash house for narcotics. (Id.) Anthony and Williams served as plaintiff's primary handlers for the DEA. (Williams and Anthony Decls. ¶ 6). At that time, plaintiff again was an illegal alien. (Atwell Decl.

14

(DE 89), ¶ 6). Accordingly, plaintiff registered as a confidential informant with the Harnett County Sheriff's Office. (Id.; (DE 171), Ex. F).

Plaintiff states that DEA officers coerced him into serving as a CI through threats of arrest and deportation. (Mem. in Supp. of Compl. p. 17). Plaintiff additionally states that he expressed concerns to the DEA that it was putting plaintiff's life in danger because DEA officers forced plaintiff to be photographed with Castenada, a cartel member, outside of plaintiff's store. (Id.) Plaintiff also states that the DEA instructed plaintiff to accompany Francisco Texta-Palacios, a cartel member, on a drug-related delivery during which other cartel members threatened plaintiff and asked plaintiff if he was a snitch. (Id.) Plaintiff, however, also admitted that defendants Manning and Taylor were present outside of the warehouse each time plaintiff went inside and that the federal defendants planned to place plaintiff in the witness protection program for his safety. (Fed. Def. Appx. pp. 203-204).

On March 15, 2012, Wake County Investigator Danny Wright ("Wright") installed video recoding equipment inside the warehouse, and defendants Manning and Taylor installed a global positioning system ("GPS") monitor on plaintiff's vehicle while plaintiff was present. (Williams Decl. ¶ 9; Taylor Decl. ¶ 3; Manning Decl. ¶ 14). On March 29, 2012, plaintiff signed an agreement to act as a CI for the DEA. (Fed. Def. Appx. pp. 133-134). Plaintiff's assistance led to two monetary seizures from the drug cartel. (Williams Decl. ¶ 9).

In late April or early May, Wright removed the video equipment from the warehouse. (Id. ¶ 10). In June 2012, defendants Anthony and Williams minimized their use of plaintiff because plaintiff was unable to provide useful information. (Id.) Plaintiff states that, at some point, defendant Anthony informed plaintiff that Rojas was "sleeping with DEA target identified as

15

Francisco-Texta Palacious." (Mem. in Supp. of Compl. p. 21). Plaintiff informed Anthony that he "wanted to quit and take [his] children and move on." (Id.) Plaintiff told Anthony that he was going to leave Rojas. (Id.) In response, Anthony told plaintiff that plaintiff had a contract and that if plaintiff did not befriend the target and collect information, plaintiff would lose his business, family, and face deportation. (Id.)

At some point, Rojas confronted plaintiff and called him a snitch. (Id. p. 22.) Rojas informed plaintiff that defendant Cornaire had told her that plaintiff was working with the DEA and ICE, and that Rojas was "gonna one day lose everything." (Id.) Plaintiff then called defendant Williams on July 3, 2012, at approximately 6:16 p.m. (Id. at 22; Sheriff's Def. Appx. p. 292). Plaintiff and Williams' accounts of the telephone call differ. Plaintiff states that he called Williams to inform Williams that Rojas knew about plaintiff's involvement with the DEA and to request protection. (Mem. in Supp. of Compl. p. 22). According to Williams' version of the telephone call, plaintiff told Williams that Rojas was cheating on plaintiff with a guy who worked as a mechanic. (Sheriff's Def. Appx. p. 292). Plaintiff told Williams that Rojas was planning to leave plaintiff and that Rojas had stolen $30,000.00 from plaintiff's store and given it to her boyfriend. (Id.) Plaintiff asked Williams if Williams would tap Rojas' telephone, and Williams refused. (Id. p. 293). Plaintiff and defendant Williams ended the conversation when they agreed to meet, along with defendant Anthony, on July 5, 2012. (Id.) Plaintiff states that he then contacted defendant Anthony, and Anthony reassured plaintiff that everything would be fine and that he did not believe Cornaire told Rojas anything. (Mem. in Supp. of Compl. p. 22).

Later on the evening of July 3, 2012, plaintiff went to the home he shared with Rojas and their 15-year old twin sons who also were at home that evening. (Christian and Alex Palma Affs.

¶ 9). Plaintiff states that Rojas began to argue with plaintiff and cut off the tip of plaintiff's finger with a machete. (Mem. in Supp. of Compl. pp. 22-23). One of plaintiff's sons, witnessed the altercation and attested that Rojas did not have a machete on the date of her murder and that plaintiff shot and killed Rojas. (Alex Aff. ¶ 9). Plaintiff, however, did sustain a minor injury to his finger. (DE 153, pp. 1-3). After plaintiff shot Rojas, defendants Manning and Taylor went to plaintiff's residence to remove the GPS tracking monitor from plaintiff's car. (Taylor Decl. ¶ 13). While plaintiff asserts that there was video surveillance available from video cameras the DEA installed in his home, the DEA denies that it installed surveillance equipment in plaintiff's home. (Manning Decl. ¶ 12; Taylor Decl. ¶ 12). The DEA terminated its relationship with plaintiff when plaintiff was arrested on July 3, 2012. (Williams Decl. ¶ 10). On August 6, 2012, defendant Cornaire was granted temporary custody of plaintiff's minor children pursuant to a consent order. (Cornaire Aff. ¶ 17 and Ex. 19).

On June 14, 2013, plaintiff pleaded guilty to second-degree murder. (Blomgren Aff. ¶ 10 and Ex. 24). Plaintiff was sentenced to a term of 196-248 months imprisonment. (Id.) After plaintiff's conviction and sentence, defendant Cornaire hired Blake, an attorney, to represent the Estate of Rojas in a wrongful death action against plaintiff in the Wake County Superior Court. (Blake Aff. ¶ 4 and Ex. 26). On September 12, 2013, the Estate of Rojas filed a "Motion for a Temporary Restraining Order, Attachment Order, and/or Appointment of a Reciever" to prevent plaintiff from selling, encumbering, or otherwise disposing of his personal property, real estate holding or any stocks, bonds or other such securities in his possession, custody, and control. (Id. ¶ 5 and Ex. 27). Blake filed the motion because plaintiff, acting through a newly appointed power of attorney Molele Yves Kimbembe, was disposing of assets and secreting property. (Id. ¶ 5).

Accordingly, Blake determined that intervention was necessary to prevent the liquidation of plaintiff's assets so that plaintiff could satisfy any judgment obtained in the wrongful death action. (Id.) The superior court granted the temporary restraining order on September 17, 2013, and then a preliminary injunction on October 7, 2013. (Id. ¶¶ 6, 7 and Exs. 23, 28). The superior court additionally appointed Brenda Martin as the Receiver for Carias Properties, LLC. (Id. ¶ 7 and Ex. 23).

On June 4, 2014, the superior court entered judgment by default in the wrongful death action and awarded the Estate of Rojas $2,000,000.00 in compensatory damages and $6,000,000.00 in punitive damages. (Id. ¶ 8 and Ex. 21). Then on July 10, 2014, the superior court entered an order to sell plaintiff's property and directed the receiver, Brenda Martin, to employ a commercial realtor to sell the only asset of Carias Properties, L.L.C.–real property located at 4004 Capital Boulevard, Raleigh, North Carolina. (Id. ¶ 9 and Ex. 29). The property then was sold yielding net proceeds in the amount of $113,233.74. (Id. ¶¶ 9-12 and Exs. 30-34). After the payment of attorneys fees and costs, the remaining net proceeds from the sale of plaintiff's property were distributed to plaintiff's sons. (Id. ¶¶ 15-19 and Ex. 23). The proceeds from the sale of plaintiff's property are the only funds which have been applied to the satisfaction of the judgment in the wrongful death action. (Id. ¶ 20).

In 2014, defendant Harrison ordered a criminal and an internal investigation into plaintiff's allegations against defendant Cornaire. (Harrison Aff. ¶ 9). At the conclusion of the investigation, the Sheriff's Department determined that there was no criminal activity or conflict of interest with respect to defendant Cornaire. (Id. ¶ 10). Defendant Cornaire, however, was disciplined for his off-duty employment for plaintiff because it violated the Sheriff's Department's policies and procedures.

18

(Id. ¶ 11). As a result of the policy violation, defendant Cornaire was demoted from Wake County Sheriff's Deputy to a detention officer on July 10, 2013. (Cornaire Aff. ¶ 23; (DE 170), Ex. A).

**DISCUSSION**

A. Motion to Apply the Presumption Test

Plaintiff's motion is not a model of clarity. Plaintiff seeks to have several facts presumed true. Plaintiff cites Federal Rule of Evidence 301, which provides: "In a civil case, unless a federal statute or these rules provide otherwise, the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption. But this rule does not shift the burden of persuasion, which remains on the party who had it originally." Plaintiff has not identified any legal presumption applicable to this action. Rather, plaintiff seeks to have certain facts presumed true due to plaintiff's allegation that defendants did not respond to discovery related to those issues. The federal defendants and defendant Manning, in response, state that they responded to each of plaintiff's discovery requests. There is no indication from the record that any defendant is withholding materials pertaining to the issues raised by plaintiff in his motion. For these reasons, plaintiff's motion is DENIED.

B. Motion for Summary Judgment

1. Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the

19

nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Anderson, 477 U.S. at 250.

2.      Analysis

Defendants raise the affirmative defense of qualified immunity in this § 1983 action. Government officials are entitled to qualified immunity from civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In other words, a government official is entitled to qualified immunity when (1) the plaintiff has not demonstrated a violation of a constitutional right, or (2) the court concludes that the right at issue was not clearly established at the time of the official's alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 236 (2009). The court first determines whether plaintiff alleged a constitutional violation related to his alleged prison conditions.

a.      Statute of Limitations

Defendants argue that plaintiff's § 1983, Bivens, and RICO claims are time-barred. The court begins its statute of limitations analysis with plaintiff's claims pursuant to § 1983 and Bivens.[10] There is no federal statute of limitations for actions brought under 42 U.S.C. § 1983. Instead, the analogous state statute of limitations applies. See Wallace v. Kato, 549 U.S. 384, 387 (2007).

_____

[10] Plaintiff also brings claims pursuant to North Carolina State law and 42 U.S.C. § 1981. Defendants do not argue that plaintiff's claims pursuant to § 1981 are time-barred. As for plaintiff's state law claims, as set forth below, the court declines to exercise supplemental jurisdiction over plaintiff's state law claims. Thus, plaintiff's § 1981 and state law claims are not included within the court's statute of limitations analysis.

Specifically, the state statute of limitations for personal injury actions governs claims brought under 42 U.S.C. § 1983 and Bivens. See id. North Carolina has a three-year statute of limitations for personal injury actions. N.C. Gen. Stat. § 1-52(5); see Brooks v. City of Winston-Salem, 85 F.3d 178, 181 (4th Cir. 1996). Although the limitations period for claims brought under § 1983 and Bivens is borrowed from state law, the time for accrual of an action is a question of federal law. Wallace, 549 U.S. at 388; Brooks, 85 F.3d at 181. A claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action. Owens v. Baltimore City State's Attorneys Office, 767 F.3d 379, 389 (4th Cir. 2014). With respect to equitable tolling, "[w]hen a state statute [of limitations] is borrowed . . . the federal court will also borrow the state rules on tolling." Shook ex rel Shook v. Gaston Cnty. Bd. of Educ., 882 F.2d 119, 121 (4th Cir. 1989); see Bd. of Regents v. Tomanio, 446 U.S. 478, 483–85 (1980); Bonneau v. Centennial Sch. Dist. No. 28J, 666 F.3d 577, 580 (9th Cir. 2012).

i.     Bivens Claims

Beginning with plaintiff's Bivens claims, the record reflects that plaintiff acted as a CI during two distinct time periods, the first being 2007 through October 16, 2009, when plaintiff was deactivated as a DEA CI, and the second being January 2012 through plaintiff's arrest on July 3, 2012. (Troster Decl. Ex. 1: Williams Decl. ¶ 3; Atwell Decl. ¶ 6). The statute of limitations for plaintiff's claims arising out of events which occurred from January 2012 through July 3, 2012, clearly are not time barred. For any allegations arising out of this time period, the statute of limitations accrued, at the latest, on July 3, 2012, when plaintiff was arrested and ceased serving as a CI. Accordingly, plaintiff's October 25, 2013, complaint was timely with respect to any claims pertaining to the time period of January 2012 through July 3, 2012.

21

As for the time period of 2007 through October 16, 2009, the statute of limitations for these claims accrued, at the latest, on October 16, 2009–when plaintiff's CI services were terminated by the DEA. (Troster Decl. Ex. 1).[11] The statute of limitation then ran for three years and expired on October 16, 2012. Because plaintiff did not file this action until October 25, 2013, his <u>Bivens</u> claims against the federal defendants and defendant Manning arising out of this time period are time-bared.[12]

ii.    Section 1983 Claims

Plaintiff asserts that defendant Cornaire regularly demanded money from plaintiff in exchange for protection and took his assets in violation of the Fourth and Fourteenth Amendments to the United States Constitution, RICO, the North Carolina Constitution, and North Carolina state law from 2007 through the date plaintiff filed this lawsuit.[13] Plaintiff's allegations suggest that the "continuing wrong" doctrine is applicable to this action. "Under the continuing wrong doctrine, the statute of limitations does not start running until the violative act ceases." <u>Marzec v. Nye</u>, 203 N.C. App. 88, 94 (2010) (quotations and citations omitted). "A continuing violation is occasioned by continual unlawful acts, not by continual ill effects from an original violation." <u>Williams v. Blue</u>

_____

[11] The court notes that the DEA deactivation document does not identify plaintiff. (Troster Decl. Ex. 1). Even if the deactivation document does not pertain to plaintiff, there is no evidence that plaintiff acted as a CI after the date Atwell retired on January 15, 2010. <u>See</u> <u>Anderson</u>, 477 U.S. at 257-58 (finding that there must be some "affirmative evidence" presented by the non-moving party to defeat summary judgment); (Atwell Decl. (DE 89), ¶ 1; (DE 150, p. 7).

[12] The court notes that the court previously deemed plaintiff's excessive force claim against defendants Brant and Halvas untimely in its March 23, 2016, order. (<u>See</u> (DE 100)).

[13] The court notes that plaintiff's claims against the remaining Sheriff's defendants either pertain to plaintiff's post-arrest time period (which are timely) or are predicated on plaintiff's claims against Cornaire.

22

Cross Blue Shield of North Carolina, 357 N.C. 170, 179 (2003) (quotation omitted). Here, plaintiff's allegations raise a genuine issue of material fact with respect to whether the continuing wrong doctrine applies, and the court DENIES the Sheriff's defendants' motion for summary judgment as to the statute of limitations.

### iii.    RICO Claims

"The statute of limitations on private civil RICO claims is four years, beginning on the date the plaintiff discovered, or should have discovered, the injury." CVLR Performance Horses, Inc. v. Wynne, 792 F.3d 469, 476 (4th Cir. 2015); Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc., 262 F.3d 260, 266 (4th Cir. 2001) ("Since PEPCO filed its complaint on July 29, 1998, the application of the statute of limitations essentially turns on the question of whether, with respect to each alleged injury, PEPCO knew or should have known of its injury prior to July 29, 1994."). Here, plaintiff dated his complaint October 22, 2013, and it was filed on October 25, 2013. Accordingly, affording plaintiff the benefit of the prison mailbox rule, plaintiff may not recover for any injuries that he "discovered, or should have discovered" before October 22, 2009. See Houston v. Lack, 487 U.S. 266, 276 (1988) (holding that a pro se prisoner's notice of appeal is filed at the moment it is delivered to prison authorities for mailing to the district court). Any injury stemming from the 2007 through October 16, 2009 CI arrangement should have been discovered by October 22, 2009. Thus, all RICO claims related to this time period are time-barred. Plaintiff's RICO claims related to plaintiff's service as a CI in 2012 are not time-barred.

### b.    Substantive Analysis of Claims

### i.    RICO

23

Plaintiff alleges RICO claims against the Sheriff's defendants, the federal defendants, and defendant Manning. RICO "does not cover all instances of wrongdoing. Rather, it is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity." US Airline Pilots Ass'n v. AWAPP A, LLC, 615 F.3d 312, 317 (4th Cir. 2010) (quoting Gamboa v. Velez, 457 F.3d 703, 705 (7th Cir. 2006)). The penalties authorized under RICO have been described as "drastic," and serve to underscore that RICO is "primarily designed to provide society with a powerful response to the dangers of organized crime." Id. (citing H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 233, 245 (1989)). As the Fourth Circuit has emphasized, caution must be exercised

> to ensure that RICO's extraordinary remedy does not threaten the ordinary run of commercial transactions; that treble damage suits are not brought against isolated offenders for their harassment and settlement value; and that the multiple state and federal laws bearing on transactions . . . are not eclipsed or preempted.

Id. (quoting Menasco, Inc. v. Wasserman, 886 F.2d 681, 683 (4th Cir. 1989)).

To state a civil RICO claim under § 1962(c), a plaintiff must allege (1) conduct, (2) an enterprise, and (3) a pattern (4) of racketeering activity (5) that causes injury to the plaintiffs. Sedima v. Imrex Co., 473 U.S. 479, 496 (1985). A plaintiff must also allege an injury to his or her business or property as a result of such conduct. Id.

1)      Enterprise

To establish liability under § 1962(c), a plaintiff must establish the existence of an enterprise that is distinct from the persons who are alleged to have committed the RICO violation. Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001). The RICO statute defines an "enterprise" to include "any individual, partnership, corporation, association, or other legal entity,

24

and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

Here, there is no evidence in the record that the Sheriff's defendants, the federal defendants, or defendant Manning were working together. Accordingly, the court analyzes plaintiff's RICO claims with respect to the Sheriff's defendants and the remaining defendants separately. With respect to the federal defendants and defendant Manning, the DEA and ICE may qualify as an enterprise. See United States v. Altomare, 625 F.2d 5, 7 (4th Cir. 1980) (citing United States v. Baker, 617 F.2d 1060, 1061 (4th Cir. 1980) (holding that a public entity may be an enterprise within the coverage of the RICO statute). Thus, plaintiff has satisfied the enterprise element of his RICO claim for the federal defendants and defendant Manning.

With respect to the Sheriff's defendants, the court first determines whether plaintiff has established the existence of an enterprise. The purported enterprise appears to be the Wake County Sheriff's Department. To establish a RICO violation, a plaintiff must establish that the defendants were associated with and participated in the "operation or management" of the enterprise. Reves v. Ernst & Young, 507 U.S. 170, 184 (1993). "In order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs." Id. at 179 (quoting 18 U.S.C. § 1962(c)). "There must be a nexus between the person and the conduct in the affairs of an enterprise. The operation or management test goes to that nexus. In other words, the person must knowingly engage in 'directing the enterprise's affairs' through a pattern of racketeering activity." University of Md. v. Peat, Marwick, Main & Co., 996 F.2d 1534, 1539 (3d Cir.1993) (quoting Reves, 507 U.S. at 179). For RICO liability, a defendant is not required to hold a managerial position in the enterprise, but only that he or she "knowingly further[s] the illegal aims

of the enterprise by carrying out the directives of those in control." United States v. Parise, 159 F.3d 790, 796 (3d Cir. 1998).

Here, plaintiff asserts that the Sheriff's Office is the enterprise for his RICO claims against the Sheriff's defendants. Plaintiff's allegations against Sheriff's defendant Blomgren pertain solely to Blomgren's role in investigating Rojas's murder for the Wake County Sheriff's Department, and plaintiff has presented no evidence to show such investigation was influenced in any manner by defendant Cornaire. Plaintiff's RICO claim, instead, centers on plaintiff's allegations of extortion and misuse of confidential information against defendant Cornaire. Plaintiff, however, has presented no evidence to suggest that defendant Harrison or the Wake County Sheriff's Department knew about plaintiff's relationship with the DEA or ICE prior to plaintiff's arrest, or that defendant Cornaire was allegedly threatening plaintiff. (Harrison Aff. ¶ 12). In fact, plaintiff states that Cornaire instructed plaintiff not to tell the DEA about any of the money plaintiff was giving to Cornaire. (Mem. in Supp. of Compl. pp. 15-16). Further, when defendant Harrison learned of plaintiff's allegations with respect to defendant Cornaire, defendant Harrison initiated both criminal and internal investigations, which resulted in defendant Cornaire receiving disciplinary action. (Id. ¶¶ 10, 11).

Because there is no evidence that the Wake County Sheriff's Office participated in, benefitted from, or even knew of, plaintiff's service as a CI, plaintiff has not established that a nexus existed between defendant Cornaire and the purported enterprise's affairs. See Reves, 507 U.S. at 179; Dahlgren v. First Nat. Bank of Holdrege, 533 F.3d 681, 689 (8th Cir. 2008) ("Although § 1962(c) liability is not limited to those with a formal position within the enterprise . . . , § 1962(c) cannot be interpreted to reach complete outsiders because liability depends on showing that the

defendants conducted or participated in the conduct of the enterprise's affairs, not just their own

affairs.") (internal quotation omitted) (emphasis in original) (internal quotations omitted). Thus,

plaintiff failed to establish the enterprise element of his RICO claim for the Sheriff's defendants, and

the Sheriff's defendants are entitled to summary judgment for this claim. The court, however,

continues its RICO analysis for the Federal defendants and defendant Manning only.

2)      Predicate Acts of Racketeering

Plaintiff next must sufficiently allege a pattern of racketeering activity. Section 1961(1) lists

the predicate acts that may constitute racketeering activity, and the plaintiff must prove each prong

of the predicate offense to establish the racketeering activity element of civil RICO. Here, plaintiff

alleges predicate acts based upon extortion. In particular, plaintiff asserts that the federal defendants

and defendant Manning intruded on his business and business relationships by coercing plaintiff to

work as a CI with threats of deportation, arrest, deportation of his customers, and seizing Mexican

cartel money from his business. Plaintiff also appears to assert a RICO violation predicated on the

misuse of confidential information.

The court begins with plaintiff's reliance upon extortion as a predicate act. To sufficiently

plead a violation of extortion under N.C. Gen. Stat. § 14–118.4, a plaintiff must establish that the

federal defendants or defendant Manning attempted to obtain plaintiff's property, with plaintiff's

consent, where such consent was induced by the wrongful use of actual or threatened force, violence

or fear. See N.C. Gen. Stat. § 14-118.4; Tryco Trucking Co. v. BelkStores Servs., Inc., 634 F. Supp.

1327, 1334 (W.D.N.C.1986); see also Smithfield Foods, Inc. v. United Food & Commercial Workers

Int'l Union, 585 F. Supp. 2d 789, 798 (E.D. Va. 2008) (explaining "for a 'state extortion offense'

to qualify as a predicate act under the federal RICO statute, the conduct must be capable of being

27

generically classified as extortionate: that is, 'obtaining something of value from another with his consent induced by the wrongful use of force, fear or threats'") (quoting Scheidler v. Nat'l Org. for Women, Inc., 537 U.S. 393, 409–10 (2003)) (emphasis omitted). Thus, even if a defendant interferes with a plaintiff's property rights, he cannot be held liable for extortion unless he receives something of value from the plaintiff. Scheidler, 537 U.S. at 404–05, 411 (holding "[b]ecause petitioners did not obtain or attempt to obtain respondents' property, both the state extortion claims and the claim of attempting or conspiring to commit state extortion were fatally flawed"); see also United States v. Gotti, 459 F.3d 296, 324 (2d Cir. 2006) (noting that mere interference with right to conduct business, even to point of causing cessation of business, is closer to coercion than extortion).

Here, plaintiff failed to establish any conduct which could plausibly be interpreted extortionate-that defendants attempted to obtain property from plaintiff with plaintiff's consent.[14] See Sekhar v. United States, 133 S. Ct. 2720, 2725 (2013) ("Obtaining property requires not only the deprivation but also the acquisition of property. . . . That is, it requires that the victim "part with" his property [], and that the extortionist "gain possession of it[.]") (internal citations and quotations omitted); Scheidler, 537 U.S. at 405 (explaining interfering with or depriving someone of property is insufficient to constitute extortion where no property is pursued or obtained from another); see also N.C. Supported Emp't v. N.C. Dept. of Health and Human Services, No. 5:10-CV-135-FL, 2010 WL 4696556, at *4 (E.D.N.C. Nov. 12, 2010) (concluding, in case involving alleged

---

[14] The court notes that the Hobbs Act also defines extortion as including the requirement of improperly obtaining the property from another. See 18 U.S.C. § 1951(b)(2); Scheidler, 547 U.S. at 9. Plaintiff, likewise, is unable to establish a predicate act for extortion under the federal statute.

scheme to force plaintiffs out of business, that plaintiffs failed to allege conduct that may be generally classified as "extortionate," and allegations did not support the inference that defendants attempted to obtain property by inducing plaintiffs' consent). Finally, it is irrational for plaintiff to think that he had any business interest in illegal proceeds from criminal activities or that he could maintain business practices with individuals who either violated the law or were illegally in the country. Accordingly, plaintiffs failed to establish a predicate act of extortion.

The court now turns to plaintiff's reliance upon the misuse of confidential information as a predicate act. Plaintiff has produced no evidence to establish that the federal defendants or defendant Manning misused confidential information. See Anderson, 477 U.S. at 257-58 (finding that there must be some "affirmative evidence" presented by the non-moving party to defeat summary judgment). Thus, plaintiff failed to establish a predicate act based upon the alleged misuse of confidential information.

3) Pattern of Racketeering Activity

The requisite "pattern of racketeering" must include "at least two [predicate] acts of racketeering activity" 18 U.S.C. § 1961(5). As stated, plaintiff failed to establish any predicate acts. Thus, plaintiff is unable to establish a pattern of racketeering activity. Based upon the foregoing, plaintiff failed to establish a RICO violation and defendants' respective motions for summary judgment are GRANTED as to this claim.

ii. Failure to Protect

Plaintiff asserts that the federal defendants, defendant Manning, and defendant Cornaire failed to protect plaintiff from the risk of harm in connection with serving as a CI in violation of the

29

Fifth and Fourteenth Amendments.[15]  Generally, a state's failure to protect an individual against private violence does not constitute a violation of the Due Process Clause of the Fourteenth or Fifth Amendment.  DeShaney v. Winnebago Cty. Dep't of Social Serv., 489 U.S. 189, 197-98 (1989). However, one exception to this rule is the state-created danger doctrine.  To establish a claim pursuant to the state-created danger doctrine, a plaintiff must demonstrate: "(1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff." Cartwright v. City of Marine City, 336 F.3d 487, 493 (6th Cir. 2003); see Estate of Allen v. City of Rockford, 349 F.3d 1015, 1022 (7th Cir. 2003).

Applying the first prong of the test to the federal defendants and defendant Manning, there is no evidence that defendant Manning or any federal defendant took affirmative action to create or increase the risk that plaintiff would be exposed to violence at the hands of any drug cartel members. Rather, the record reflects that the federal defendants took steps to protect plaintiff while plaintiff was working as a CI.  (Fed. Def. Appx. p. 203-04).  Additionally, plaintiff faced a certain degree of risk before he agreed to cooperate with the DEA because he voluntarily participated in the drug trade.  Plaintiff's conclusory allegations that he informed DEA and ICE officers that they were putting his life in danger  (see Mem. in Supp. of Compl. p. 17) are insufficient to satisfy the first

---

[15]  Plaintiff was not convicted of any crime at the time of the alleged failure to protect. Thus, the Fourteenth Amendment and not the Eighth Amendment is applicable to this claim.  See Graham v. Conner, 490 U.S. 386, 392 n.6 (1989) (stating that Eighth Amendment protections do not attach until after conviction and sentence).

prong of the state-created danger test.  Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009); see Walker v. Detroit Pub. School Dist., 535 F. App'x 461, 466 (6th Cir. 2013) (finding that conclusory statements that merging two schools containing rival gang members created increased risk of gang violence insufficient to establish the state-created danger doctrine); Summar v. Bennett, 157 F.3d 1054, 1059 n. 2 (6th Cir. 1998) (police disclosure of plaintiff confidential informant's identity for inclusion in indictment of third party did not create or increase the risk of private violence to the plaintiff); see also, Gatlin ex. rel. Gatlin v. Green, 227 F. Supp.2d 1064, 1075 (D. Minn. Sept. 26, 2002) ("There is no explicitly recognized right to security from violence for confidential police informants."), aff'd, 362 F.3d 1089 (8th Cir. 2004).

As for defendant Cornaire, plaintiff asserts that defendant Cornaire took affirmative action to increase plaintiff's risk of danger when defendant Cornaire told Rojas that plaintiff was working for the DEA, a statement which plaintiff contends angered Rojas and caused her to attack plaintiff with a machete.  (Mem. in Supp. of Compl. pp. 22-23).  There is no evidence in the record to indicate that Cornaire told Rojas that plaintiff was working for the DEA.  There, additionally, is no evidence that Rojas attacked plaintiff with a machete.  Rather, plaintiff's claim that Rojas was in possession of a machete on the date of her murder is specifically contradicted by Alex Palma's eye-witness account of the murder.  (Alex Aff. ¶ 9).  Because there simply is no evidence to support plaintiff's assertion that defendant Cornaire took affirmative action to expose plaintiff to danger from either Rojas or a drug cartel, plaintiff is unable to establish the first prong of the state-created danger test with respect to defendant Cornaire.  See Anderson, 477 U.S. at 257-58 (finding that there must be some "affirmative evidence" presented by the non-moving party to defeat summary judgment).  Because plaintiff has not established the first prong of the state-created interest test

31

for any defendant, the remaining two prongs, likewise, fail to demonstrate a state-created interest. Thus, defendants are entitled to qualified immunity for this claim.

iii.     Involuntary Servitude

Plaintiff alleges that defendant Manning and the federal defendants subjected him to involuntary servitude in violation of the Thirteenth Amendment because they forced him to serve as a CI by threatening him with jail and or deportation. The Thirteenth Amendment provides that "[n]either slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. Am. XIII. The protection of the Thirteenth Amendment are intended "to cover those forms of compulsory labor akin to African slavery which in practical operation would tend to produce like undesirable results." United States v. Kozminski, 487 U.S. 931, 942 (1988) (internal citation and quotation marks omitted); Herndon v. Chapel Hill–Carrboro City Bd. of Educ., 89 F.3d 174, 180–81 & n. 3 (4th Cir. 1996) (holding that Thirteenth Amendment prohibits only compulsory labor "akin to African slavery" enforced by "physical or legal coercion")); see also, Crawford v. Louisiana, No. 14-1190, 2015 WL 854035, at *4 (E.D. La. Feb. 26, 2015) ("Application of the Thirteenth Amendment should be confined to those situations that are truly akin to the slavery that gave rise to it.").

Although the United States Supreme Court has recognized the possibility that threatening an immigrant with deportation could constitute threat of legal coercion that induces involuntary servitude, the Court has not specifically held that such conduct violates the Thirteenth Amendment. See Kozminski, 487 U.S. at 948. Likewise, plaintiff's ability to bring a Thirteenth Amendment claim is not clearly established law. See Middlebrooks v. Leavitt, 525 F.3d 341, 349 (4th Cir. 2008)

(stating that § 1981 does not "provide a remedy against federal officials."). Accordingly, plaintiff has not alleged a violation of clearly established law, and defendants are entitled to qualified immunity. See Pearson, 555 U.S. at 236 (holding that district court may examine whether right was clearly established before asking whether the officer's conduct violated a constitutional right); Al Janko v. Gates, 831 F. Supp. 2d 272, 280 n.13 (D.D.C. Dec. 22, 2011) ("[B]ecause the rights plaintiff seeks to invoke—specifically his own Fourth, Fifth, and Thirteenth Amendment rights, . . . —were not clearly established at the time of his detention, the individual defendants would be entitled to qualified immunity even if a Bivens action were implied.") (citation omitted), aff'd, 741 F.3d 136 (D.C. Cir. 2014).

Even if plaintiff's ability to bring a Thirteenth Amendment claim against defendants was clearly established, plaintiff still has failed to establish a Thirteenth Amendment violation. In particular, plaintiff's own testimony contradicts his allegations that defendant Manning and the federal defendants coerced plaintiff into serving as a CI. ((DE 96), Ex. S-1). Specifically, plaintiff states that "[t]he DEA did not want [him] to be deported," and that defendants Atwell and Cornaire agreed to assist plaintiff find an immigration attorney so "they could get [plaintiff's] deportation stopped so [plaintiff] could continue to work for them." (Fed. Def. Appx. p. 63). Plaintiff, additionally, stated that the DEA "threatened [him] with [deportation], but that was not their intention to have [plaintiff] deported." (Id.) Finally, plaintiff has produced no evidence to establish that the federal defendants or defendant Manning threatened plaintiff with deportation or that plaintiff feared deportation from January 2012 through his arrest on July 3, 2012. Further, there is absolutely no evidence that defendant Manning took any action to coerce plaintiff to serve as a CI.

33

Thus, plaintiff failed to establish a violation of the Thirteenth Amendment and defendant Manning and the federal defendants are entitled to qualified immunity for this claim.[16]

iv.    Fourth Amendment

Plaintiff contends that defendant Manning and the federal defendants violated his rights pursuant to the Fourth Amendment because they placed a GPS unit on plaintiff's vehicle and surveillance equipment at plaintiff's home and warehouse. The federal defendants and defendant Manning admit that they installed a GPS tracking unit on plaintiff's car and surveillance equipment in a warehouse plaintiff rented, but deny that they installed or authorized the installation of surveillance equipment in plaintiff's home. (Manning Decl. ¶ 12; Williams Decl. ¶ 9; Taylor Decl. ¶ 12).

The court begins with plaintiff's assertion that defendant Manning and the federal defendants placed surveillance equipment inside of plaintiff's home without his consent or without obtaining a warrant. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586 (1980); United States v. Yengel, 711 F.3d 392, 396 (4th Cir. 2013).

As evidence to establish that surveillance equipment was installed in his home, plaintiff

---

[16] Generally, § 1981 forbids racial discrimination in the making and enforcement of contracts. See 42 U.S.C. § 1981; Green v. Monette, No. 4:14-CV-20-FL, 2014 WL 3645433, at *5 (E.D.N.C. July 22, 2014). Aside from his involuntary servitude claim, plaintiff does not explain how his ability to make and enforce contracts was impaired by discrimination based upon his race in connection with any defendant. Thus, defendants' motion for summary judgment is GRANTED as to any remaining claims pursuant to § 1981. See Ashcroft, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

relies solely on a "Crime Scene Entry Report," reflecting that defendants Taylor and Manning entered the crime scene on July 3, 2012. Defendants Taylor and Manning do not dispute that they visited plaintiff's residence on July 3, 2012. (Manning and Taylor Decls. ¶ 14; Williams Decl. ¶ 10). They do, however, dispute the purpose of their visit, and attest that they went to the plaintiff's residence on July 3, 2012, solely to remove the GPS tracking unit from plaintiff's car. (Williams Decl. ¶ 10). Plaintiff has presented no evidence to suggest that any defendant installed surveillance equipment inside of his home. Thus, plaintiff failed to establish a Fourth Amendment violation, and defendant Manning, and the federal defendants are entitled to qualified immunity for this claim. See Anderson, 477 U.S. at 257-58 (finding that there must be some "affirmative evidence" presented by the non-moving party to defeat summary judgment).

The court next turns to plaintiff's Fourth Amendment challenge to the installation of a GPS unit on his car. The United States Supreme Court in United States v. Jones, 565 U.S. 400 (2011), held that the government's "installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search'" within the meaning of the Fourth Amendment. Id. at 404. Voluntary consent to a search, however, is an exception to the warrant requirement. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). Here, the record reflects that plaintiff was aware that defendants Taylor and Manning installed the GPS unit on his car. (Federal Def. Appx. p. 41). While plaintiff states that he told the DEA officers that he objected to the installation of the GPS device, there is no evidence to support this allegation. Rather, the record reflects that plaintiff was voluntarily cooperating with the DEA at that time. (Id. pp. 133-134).

In addition to the issue of consent, there is no evidence that plaintiff's privacy actually was invaded. A "search occurs when the government violates a subjective expectation of privacy that

35

society recognizes as reasonable." <u>Kyllo v. United States</u>, 533 U.S. 27, 33 (2001) (citing <u>Katz v. United States</u>, 389 U.S. 347, 361(1967)). The actual infringement of privacy in an action involving the installation of a GPS unit occurs, not when the unit is installed, but when the electronic data is disclosed to the DEA or entity at issue. <u>See</u> <u>United States v. Karo</u>, 468 U.S. 705, 712 (1984) ("[W]e have never held that potential, as opposed to actual, invasions of privacy constitute searches for purposes of the Fourth Amendment. A holding to that effect would mean that a policeman walking down the street carrying a parabolic microphone capable of picking up conversations in nearby homes would be engaging in a search even if the microphone were not turned on."); <u>see also Jones</u>, 565 U.S. at 419 ("It is clear that the attachment of the GPS device was not itself a search; if the device had not functioned or if the officers had not used it, no information would have been obtained.") (Alito, J. concurring). Here, plaintiff does not describe any circumstances involving the disclosure of electronic data to the DEA or the use of such data by the DEA. Accordingly, plaintiff failed to establish a Fourth Amendment violation, and defendants are entitled to qualified immunity for this claim.

Finally, the court addresses plaintiff's assertion that defendant Manning[17] and the federal defendants installed surveillance equipment in the warehouse plaintiff rented with the DEA without plaintiff's consent. As stated, voluntary consent to search is an exception to the warrant requirement. <u>See</u> <u>Schneckloth</u>, 412 U.S. at 219. A warrantless search may be proper if law enforcement receives voluntary consent from "an occupant who shares, or is reasonably believed

---

[17] Manning attests in his affidavit that he was not involved with the installation of surveillance equipment in the warehouse. (Manning Decl. ¶ 13). Plaintiff has presented no evidence to suggest that defendant Manning was involved with the installation of surveillance equipment at the warehouse.

36

to share, authority over the area in common with a co-occupant who later objects." Georgia v. Randolph, 547 U.S. 103, 106 (2006) (holding that a present co-occupant's refusal to consent to a search prevails over a present co-occupant's consent to the search). As discussed by the Fourth Circuit in Webb v. Brawn, 625 F. Appx. 191, 193 (4th Cir. 2015), common authority rests on:

> mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

Id.; (citing U.S. v. Matlock, 415 U.S. 164, 171 n. 7 (1974)).

Here, the record reflects that plaintiff agreed to work as a CI for the DEA in February 2012, after officers discovered plaintiff searching for a warehouse to serve as a stash house for narcotics. (Williams Decl. ¶ 4). After his discovery, plaintiff agreed to cooperate with the DEA, and Wright installed recording equipment in the warehouse plaintiff rented. (Id. ¶ 9; Fed. Def. Appx p. 133, 134). Although plaintiff states that he rented the warehouse, he admits that the DEA paid the rent on the warehouse. (Fed. Def. Appx p. 199). Accordingly, plaintiff and the DEA had joint control over the warehouse. Under these circumstances, it was reasonable for plaintiff to recognize that the DEA may conduct a search of the property, particularity where both the DEA and plaintiff were aware that the warehouse was being used for illegal drug activity. See Webb, 625 F. Appx. at 193. Thus, plaintiff failed to establish a Fourth Amendment violation, and defendants are entitled to qualified immunity.

v.    Due Process Claims

The Fourteenth and Fifth Amendments to the Constitution provides, in pertinent part, that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S.

37

Const. Amend. XIV. "[I]n order to claim entitlement to the protections of the due process clause—either substantive or procedural—a plaintiff must first show that he has a constitutionally protected 'liberty' or 'property' interest, and that he has been 'deprived' of that protected interest by some form of 'state action.'" Stone v. University of Maryland Medical System Corp., 855 F.2d 167, 172 (4th Cir. 1988) (quoting Board of Regents v. Roth, 408 U.S. 564 (1972) and Daniels v. Williams, 474 U.S. 327 (1986)).

1)      Defendant Cornaire

Plaintiff asserts that defendant Cornaire deprived him of property in violation of the Fourteenth Amendment's Due Process Clause. In support, plaintiff contends, Cornaire demanded money from plaintiff on a regular basis, forced plaintiff to name Cornaire as the executor of plaintiff's will, forced plaintiff to name Cornaire power of attorney, and collected rent on plaintiff's property after plaintiff's arrest. (Mem. in Supp. of Compl. pp. 15, 16, 18, 21, 24).

Beginning with plaintiff's procedural due process claim, plaintiff is not entitled to relief because even "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post[-]deprivation remedy for the loss is available." Hudson v. Palmer, 468 U.S. 517, 533 (1984); see Mora v. City of Gaithersburg, 519 F.3d 216, 230–31 (4th Cir. 2008). Here, an adequate post-deprivation remedy is available to plaintiff in state court. See, e.g., Wilkins v. Whitaker, 714 F.2d 4, 6–7 (4th Cir. 1983). Because plaintiff has an adequate post-deprivation remedy in state court, his procedural due process claim fails.

As for substantive due process, the Fourth Circuit defines it as "an absolute check on certain governmental actions notwithstanding the fairness of the procedures used to implement those

actions." <u>Front Royal and Warren County Industrial Park Corp. v. Town of Front Royal, Virginia</u>, 135 F.3d 275, 287–88 (4th Cir.1998) (internal quotation omitted). The substantive due process check "is warranted only where no process could cure the deficiencies in the governmental action . . . In other words, governmental action offends substantive due process only where the resulting deprivation of life, liberty, or property is so unjust that no amount of fair procedure can rectify it." <u>Id.</u>

Here, the court does not find the alleged deprivation so unjust as to be incapable of avoidance by any procedural protections. Moreover, post-deprivation state remedies are available to plaintiff. Thus, plaintiff has not established a substantive due process violation. <u>See</u> <u>Williams v. Crawford</u>, 449 F. App'x 288, 289 (4th Cir. 2011) ("Because Williams had an adequate post-deprivation remedy under Virginia law for the allegedly wrongful confiscation, his property was not taken without due process."); <u>see also</u>, <u>Davis v. Schifone</u>, 185 F. Supp. 2d 95, 101(D. Mass. Feb. 6, 2012) (finding no due process violation where police officer stole money from an arrestee's wallet because intentional deprivations of property do not violate the Due Process Clause). Because plaintiff fails to establish a due process claim in connection with his lost, stolen, or confiscated property, the Sheriff's defendants are entitled to qualified immunity for these claims.

### 2) Federal Defendants

Defendant asserts that defendant Manning and the federal defendants interfered with his business operations while plaintiff was acting as a CI in violation of the Fifth Amendment's Due Process Clause. Specifically, plaintiff asserts that the federal defendants interfered with his business when they arrested plaintiff for immigration violations and arrested plaintiff's clients. (Mem. in Supp. of Compl. pp. 27-28). Plaintiff also asserts that the federal defendants interfered with his

business and prospective business relations by seeking plaintiff's electronic and paper client files. (Id. p. 22). Finally, plaintiff asserts that defendant Manning interfered with plaintiff's business relations when he installed electronic surveillance equipment. (Id. p. 30).

The court first determines whether plaintiff has identified a liberty or property interest protected by the Due Process Clause. Plaintiff, in part, hinges his due process claim on an alleged injury to his business reputation due to his arrest, the arrest of his clients, and review of plaintiff's business records. As an initial matter, the court notes that plaintiff has submitted numerous business records in support of this claim. ((DE 171), Ex, A-E). However, each of the business records provided by plaintiff relate to a time period which is outside of the statute of limitations for the purposes of this action. Moreover, the existence of documents, in and of themselves, do not demonstrate that any defendant interfered with plaintiff's business. Finally, an injury to reputation alone is insufficient to constitute a deprivation of a liberty or property interest protected under the Fourteenth Amendment. See Siegert v. Gilley, 500 U.S. 226, 233 (1991) ("[I]njury to reputation by itself [is] not a liberty interest protected under the Fourteenth Amendment") (internal quotations omitted); Paul v. Davis, 424 U.S. 693, 711 (1976); Goulding v. Feinglass, 811 F.2d 1099, 1103 (7th Cir. 1987) ("[T]he infliction by the government of a stigma on one's reputation, without more, does not infringe upon a liberty interest protected by the Constitution's due process safeguards."), cf. College Sav. Bank v. Florida Prepaid Postsecondary Ed. Expense Bd., 527 U.S. 666, 675 (1999) ("The assets of a business (including its good will) unquestionably are property, and any state taking of those assets is unquestionably a 'deprivation' under the Fourteenth Amendment.").

Here, plaintiff has not produced any evidence to suggest that any defendant's actions adversely impacted his business. A plaintiff's mere feeling of being stigmatized is not enough to

40

successfully allege his rights have been infringed.  See Goulding, 811 F.2d at 1103 ("Even though [plaintiff] feels he may have been stigmatized by the investigations and statements allegedly made by the defendants, this does not amount to the deprivation of a liberty interest.").  Thus, plaintiff has not established a due process violation.

To the extent plaintiff claims that any defendant's actions interfered with his fundamental right to work, his claim fails.  There is no constitutional right to maintain a business or earn a profit.  Baltimore Air Transport, Inc. v. Jackson, 419 F. App'x 932, 937 (11th Cir. 2011).  Even if such right existed, plaintiff admits that he was engaged in illegal activities and knowingly associating with persons involved with the drug trade.  (Fed. Def. Appx. pp. 43-44).  It is absurd for plaintiff to suggest that he had any property interest in funds obtained from illegal activities such as the monies seized by the DEA in connection with plaintiff's cooperation or the drug money laundered through plaintiff's businesses.  Based upon the foregoing, plaintiff failed to establish that defendant Manning or the federal defendants deprived him of a property interest, and, thus, plaintiff failed to establish a due process violation.  Thus, defendants are entitled to qualified immunity for this claim.

vi.  Supervisor Liability

Plaintiff's claims against defendants Holder, the DEA Director, and the ICE Director are predicated upon a theory of supervisor liability.   Given the fact that there is no underlying constitutional violation, plaintiff's supervisor liability claims lack merit.  See Hinkle v. City of Clarksburg, W. Va., 81 F.3d 416, 420 (4th Cir. 1996) (holding that absent an underlying constitutional violation, no § 1983 liability attaches to a supervisor); Thomas v. Holly, 533 F. App'x 208, 221 (4th Cir. 2013) (noting that a finding of bystander liability for a defendant required a finding of excessive force by another defendant).

41

vii.     State Law Claims

A district court may decline to exercise supplemental jurisdiction over a claim if the district court dismisses all claims over which it had original jurisdiction.  28 U.S.C. § 1367(c)(3); see Shanaghan v. Cahill, 58 F.3d 106, 110 (4th Cir. 1995); see also, Gantt v. Whitaker, 203 F. Supp. 2d 503, 512 (M.D.N.C. Feb. 26, 2002) (declining to exercise supplemental jurisdiction over plaintiff's state law claims including those again the sheriff's official bond), aff'd, 57 F. App'x 141 (4th Cir. 2003).  The court has dismissed plaintiff's federal claims, which were the sole claims over which it had original jurisdiction.  In the interest of judicial economy, fairness, and comity, the court will not exercise supplemental jurisdiction over plaintiff's state law negligence claims.  Thus, plaintiff's state law negligence claims are dismissed without prejudice.

## CONCLUSION

Based on the foregoing, plaintiff's motion for this court to "apply the presumption test toward all defendants" (DE 182) is DENIED; and defendants' respective motions for summary judgment (DE 127, 132, 135) are GRANTED.  The court DECLINES to exercise supplemental jurisdiction over plaintiff's state law claims, and those claims are DISMISSED WITHOUT PREJUDICE.  The clerk of court is DIRECTED to close this case.

SO ORDERED, this the 27th day of March, 2017.


LOUISE W. FLANAGAN
United States District Judge

42